O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |


| Present: | The Honorable Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy K. Hernandez | Not Present | n/a |
|---|---|---|
| Deputy Clerk | Court Reporter | Tape No. |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **(In Chambers) Order Finding For Defendants After Court Trial**

In the present ERISA action pursuant to 29 U.S.C. § 1001 *et seq*., the Court must determine whether a Claims Administrator properly terminated benefits at the Acute Inpatient level of care after determining that the patient could safely and effectively move toward recovery at the partial hospitalization level. A bench trial on the administrative record was held on December 13, 2011. Having considered the arguments and evidence presented, the Court finds for Defendants. This constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

I.     Background

Pacific Shores Hospital, on behalf of Ann Knutson, brings this action against Defendants Wells Fargo & Company Health Plan ("Wells Fargo") and United Behavioral Health ("UBH") alleging wrongful denial of benefits arising from the discontinuation of Ms. Knutson's mental health treatment at the Acute Inpatient (full-hospitalization) level of care. Ms. Knutson was admitted to Pacific Shores Hospital on January 25, 2010 due to complications from anorexia, depression, suicide ideation and severe laxative abuse. At that time, UBH, the Claims Administrator for Co-Defendant Wells Fargo's employee mental health plan ("the Plan"), determined that Ms. Knutson met the Plan's requirements for treatment at the Acute Inpatient level of care. However, UBH subsequently concluded that continued services at the Acute Inpatient level were no longer warranted as of February 14, 2010, because ongoing care could be provided effectively at the partial hospitalization level.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|----------|----------------------|------|-------------------|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

       The decisional issues in this case center on:  (1) whether the plan documents properly delegated discretionary authority to UBH in making benefits determinations such that the abuse of discretion standard of review applies, (2) whether a conflict of interest or procedural irregularities justify increased skepticism, (3) whether Plaintiff may rely on evidence outside the Administrative Record, and (4) whether UBH improperly discontinued Ms. Knutson's benefits at the Acute Inpatient level of care.[1]  For the following reasons, the Court reviews UBH's decision under the abuse of discretion standard, limits its review to the administrative record, and upholds the adverse benefits determination.

II.    Findings of Fact

    A.    The Wells Fargo & Company Health Plan

       Ann Knutson is a forty-three-year-old woman employed by Wells Fargo & Company. (AR0022).  As an employee, she was a covered participant in the Wells Fargo & Company Health Plan ("Plan").  (AR0627).  All benefits under the Plan are self-insured by Wells Fargo, the principal plan sponsor, who bears the risk of funding all benefits claims.  (AR0522).  Wells Fargo is also the "plan administrator," but contracts with certain third-party administrators to provide claims administration services.  (AR0069).  These third-party administrators are referred to as "claims administrators."  (AR0069).  OptumHealth Behavioral Solutions, a trade name of UBH, is the claims administrator for mental health and substance abuse benefits.  (AR0196). The Court will first outline the portions of the plan documents relevant to whether UBH was granted discretionary authority in administering claims.

_____

[1]Until recently, a central issue in this case involved the question of whether UBH, as a third-party claims administrator with the final authority to make claims determinations but with no liability to fund even meritorious claims, was a proper defendant in an action under 29 U.S.C § 1132(a)(1)(B) following the Ninth Circuit's recent holding in *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202 (9th Cir. 2011) (en banc).  UBH devoted considerable time to this argument in its Opening and Reply Trial Briefs, and at oral argument on the initial trial date, prompting the Court to continue the trial in order to allow the Plaintiff to add the Plan as a defendant.  Incredibly, UBH then waited until the morning of the new trial date, before abandoning this objection and stipulating to its status as a proper defendant.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

     1.    <u>Discretionary Authority Under the Plan</u>

The Plan unambiguously grants discretion to the Plan Administrator in determining benefits and expressly grants the Plan Administrator the right to delegate this discretionary power to authorized "claims administrators." (AR0535). However, the parties disagree on what constitutes a proper plan document, and whether, upon consideration of those documents, the Plan effectively delegated its discretionary power to UBH. Plaintiff acknowledges the Plan is a proper plan document, but disputes that discretionary authority may properly be delegated by language contained in a Summary Plan Description ("SPD") or an Administrative Services Agreement ("ASA"). The Plan states that "[t]his Plan Statement, together with the applicable Insurance Policies, Summary Plan Descriptions, and rules and regulations of the Administrator shall constitute the written plan documents for the Plan." (AR0517). The relevant excerpts from the Plan, SPD, and ASA purporting to delegate the Administrator's discretionary authority to UBH are as follows:

     a.    <u>The January 1, 2010 Plan</u>

6.1    Administration.

(a)    Self-Insured Health Programs. The Administrator shall control and manage the operation and administration of the Self-Insured Health Programs and make all decisions and determinations thereto. The Administrator, and any Claims Administrator to whom such authority has been delegated pursuant to this Section 6, shall have the discretionary authority and responsibility to decide all factual and legal questions under the Self-Insured Health Programs, to interpret and administer the terms and conditions of the Self-Insured Health Programs, decide all questions concerning the eligibility of any persons to participate in the Self-Insured Health Programs, grant or deny benefits under the Self-Insured Health Programs, construe any ambiguous provision of the Self-Insured Programs' documents, correct any defect, supply any omission, or reconcile any inconsistency as the Administrator, in its discretion may determine. The Administrator may delegate its administrative duties to . . . entities independent of the Administrator.

(AR0535).

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

## CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|----------|----------------------|------|-------------------|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

        b.        The Summary Plan Description ("SPD")

"Wells Fargo contracts with third-party administrators to provide claims administration services.  These third party administrators are referred to as claims administrators."  (AR0069).  The Plan Administrator is Wells Fargo & Company, and it has the full discretionary authority to administer and interpret the plan.  (AR0070).  "Wells Fargo may delegate its duties and discretionary authority to accomplish those duties to certain designated personnel, including but not limited to the Director of Human Resources and the Director of Compensation and Benefits."  (AR070).  OptumHealth Behavioral Solutions (UBH) is the claims administrator for mental health benefits and provides confidential referrals for managed mental health and substance abuse care.  (AR0196).

        c.        Administrative Services Agreement (ASA)

Benefit Determination and Appeals.  You [Wells Fargo] appoint us [UBH] as a named, ERISA fiduciary with respect to (i) performing fair and impartial review of initial claims, (ii) performing the fair and impartial review of initial appeals, and (iii) performing the fair and impartial review of final appeals for urgent care claims.  With respect to these functions, you delegate to us the discretionary authority to (i) construe and interpret the terms of the Plan, and (ii) determine the validity of charges submitted to us under the Plan.  Except for urgent care claims, this delegation is subject to your retention of full responsibility as Plan Administrator for the final review of denied claims….

(AR0474-AR0475).

        2.        The Claims Administration Procedure

The parties dispute whether Acute Inpatient care was medically necessary beyond the February 14, 2010 last-covered date according to the Plan, the SPD, and UBH's own Level of Care guidelines.  The SPD states that prior authorization is required to receive benefits for inpatient hospital services, a determination by UBH that a given mental health or substance abuse treatment is "medically necessary" is a prerequisite to coverage, and "medical necessity" is to be determined based on the applicable UBH coverage criteria guidelines.  (AR0078, AR0200).  "Medical necessity" encompasses the further precondition that "[t]he service [] be

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|----------|----------------------|------|-------------------|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

delivered at an appropriate frequency and level of care, and in an appropriate setting for the member's condition." (AR0081). The Plan expressly excludes from coverage and will not pay benefits for care that does not meet the UBH coverage criteria guidelines. (AR0201).

There are two Level of Care guidelines applicable to the present case: the Acute Inpatient guidelines that determined Ms. Knutson was properly admitted, and the Continued Service criteria that determined whether ongoing benefits would be authorized and at what level of care. Because the Continued Service criteria include the requirement that the "member continue[] to meet the criteria for the current level of care," but do not require that the same Acute Inpatient criterion be met, it is necessary to outline the all the Acute Inpatient criteria. However, as each of the Continued Service criteria must be met in order to receive the same level of ongoing care, the Court need only outline the Continued Service criteria UBH found were no longer met: Continued Service criteria 1, 2, and 9.

**Acute Inpatient**

Acute units are hospital based structural treatment services that provide 24-hour nursing care and monitoring. They are typically secured units. Any one of the following criteria must be met:

1. Serious and imminent risk of harm to self or others due to a behavioral health condition, as evidence by, for example:
> a. Recent and serious suicide attempt(s) as indicated by the degree of intent, impulsivity, and/or impairment of judgment.
> b. Current suicidal ideation with intent, realistic plan and/or available means, or other serious life threatening, self-injurious behavior(s)
> c. Recent self-mutilation that is medically significant and/or potentially dangerous.
> d. An active and realistic plan, intent, and available means to seriously injure another person.
> e. Recent Assaultive behaviors that indicate a high risk for serious injury to others.
> f. Recent and serious physically destructive acts that indicate a high risk for recurrence and serious injury to self or others.

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

    g.  Severe delusional and psychotic behavior that places a person at risk for harm to self or others.

2.  Serious and acute deterioration in functioning from a behavioral health condition that significantly interferes with the member's ability to safely and adequately care for themselves in the community.

3.  Severe disturbance in mood, affect, or cognition that results in behavior that cannot be managed safely in a less restrictive environment.

4.  Imminent risk of deterioration in functioning due to the presence of severe, multiple and complex psychosocial stressors that are significant enough to undermine treatment at a lower level of care.

5.  Recommended behavioral health treatment of a member with a serious medical condition that requires 24-hour management.

6.  Community support services that might otherwise augment ambulatory mental health services and avoid the need for hospitalization are unavailable.

….

Note:  This guideline is intended to be used in conjunction with the Continued Service guideline when assessing the need for a continuing stay.

(AR0055-AR0058).

**Continued Service** - Each of the following must be met

1.  The member continues to meet the criteria for the current level of care.

2.  The member is presenting with symptoms and a history that demonstrate a significant likelihood of deterioration in functioning/relapse if transitioned to a less restrictive or less intensive level of care.

….

9.  The member cannot effectively move toward recovery and be safely treated in a lower level of care.

….

(AR0410-AR0411).

    The Court next outlines the patient's medical history and UBH's administration of her benefits claim.

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

JS-6

## CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

B.    Plaintiff's Claim for Continuing Acute Inpatient Service

The following is taken from the Administrative Record[2] and constitutes the relevant facts documenting Ms. Knutson's medical and treatment history and UBH's benefits determinations.

1.    Ms. Knutson's Admission (Care Advocate Notes from January 27, 2010)

Plaintiff was admitted to Pacific Shores Hospital for 24-hour inpatient care on January 25, 2010 with a diagnosis of severe depression, suicide ideation and anorexia nervosa. (AR0413). She presented with a skeletal appearance and was experiencing suicide ideation with a plan to overdose. (AR0414). Her laxative abuse had worsened over the last few months and she was now taking 130 Sena-S laxatives per day. (AR0414). At a height of 66 inches she weighed between 81 and 88 lbs[3] and was determined to be at 65% of her ideal body weight. (AR0415, PSH485). She had a BMI of 13.52. (AR0415). She was diagnosed with pneumonia, had fainting spells due to worsening laxative abuse, was eating only 200 calories per day, and was purging through self-induced vomiting with increasing frequency. (AR0414-AR0415). Her medical history was remarkable for one prior suicide attempt in 2007, when she took an entire bottle of laxatives. (AR0414). She had no history of self-mutilation, violence or substance abuse. (AR0414). She had been experiencing amenorrhea for the past five years. (AR0415). Her husband was described as supportive, but not emotional, and she had a 17 year-old daughter who feared she would die. (AR0414).

---

[2]Plaintiff urges the Court to consider facts outside the Administrative Record. Specifically, Plaintiff asks the Court to consider Plaintiff's medical records maintained by Pacific Shores Hospital and various medical journal articles relating to the discharge of patients with eating disorders. Because the applicable standard of review is abuse of discretion, there is no conflict of interest, and UBH did not identify new reasons for the denial on appeal (as outlined in Part III, *infra*) the Court may not consider facts outside the administrative record. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F. 3d 955, 970 (9th Cir. 2006) (en banc); *Saffron v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008).

[3]The record is inconsistent regarding Plaintiff's weight at intake. UBH's Care Advocate records indicate the patient weighed 88 lbs. (AR0414).

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

The treatment plan was to stabilize the patient medically, taper her off the laxatives, and begin refeeding. (AR0415). The patient was expected to develop pancreatitis and anemia from refeeding. (AR0415). It was decided to go slow with her on carbohydrates and fat with a weight gain goal of 2 to 2.5 pounds per week. (AR0415). The discharge criteria were identified as a step-down to residential treatment care at 85% of ideal body weight, when the patient was no longer purging, was no longer suicidal, and once she was through the laxative taper. (AR0415). The discharge plan was to step-down to partial hospitalization after four weeks at an inpatient level of care. (AR0415).

The treatment notes indicate that UBH Acute Inpatient Level of Care guideline 5 was met: the member requires 24-hour management of a serious medical condition. (AR0415). Four days of inpatient level of care were authorized from January 25th through 28th. (AR0415).

### 2.   January 29, 2010 Care Advocate Review

On January 29, 2010, the UBH Care Advocate again reviewed the patient's condition, finding her activities of daily living were okay, she was eating 100% of her food and had good compliance with nutritional rehabilitation, but that her sleep was disrupted, she had distorted body issues and her active suicidal ideation continued. (AR0417-AR0418). Her weight had gone down to 75.5 pounds due to "diuresing." (AR0418). She had tapered down to 50 tablets of Sena per day. (AR0418). Her treatment plan included checks every 15 minutes for suicide precautions and 2.5 hours of post-meal supervision. (AR0418). The discharge plan again identified a total of 4 weeks of inpatient care. (AR0418). The UBH Care Advocate concluded the patient continued to meet the fifth criterion of the Acute Inpatient care guidelines, and authorized three further days from January 29 through January 31, 2010. (AR0418-419).

### 3.   February 4, 2010 Care Advocate Review

On February 4th an additional four days were approved from February 1 through 4, finding that the fifth criterion of the Acute Inpatient care guidelines was still met. (AR0422). The UBH treatment notes indicate the patient's weight had increased to 79 pounds, she was "just beginning" to associate with her peers, her sleep and activities of daily living were improving, and she was eating 100% of her food. (AR0421). She was still positive for suicide ideation with plan and intent to overdose or starve to death, was "very anxious about being tapered off the

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|----------|----------------------|------|-------------------|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

laxatives," and was "focused on bowels and laxatives." (AR0420-AR0422). She discussed her struggles with body image and her grief and loss over several miscarriages. (AR0421). Ms. Knutson had pancreatitis, lipase at 125, and a "very high" amylase at 173. (AR0422). She was experiencing abdominal pain after eating and her diet was adjusted to lower her carbohydrates in exchange for protein. (AR0422). Her treatment plan still included suicide checks on fifteen-minute intervals, along with meal supervision and 2.5 hours of supervision post-meals. (AR0422). The estimated length of stay at an inpatient level of care was "another [week], be[en] here for a while (4 [weeks] total)."[4] (AR0422).

4.   February 5, 2010 Care Advocate Review

On February 5, 2010, the patent was down to five laxative tablets per day. (AR0424). The notes indicate that the patient's "abnormal labs are typical for an anorectic. It's as they get better that potential medical problems can set in: anemia, edema, start having cardiac problems…." (AR0424). Ms. Knutson's potassium was currently at 4.1, she had pancreatitis, her lipase was 82, and her amilase was 150. (AR424). Inpatient care was authorized through February 7, 2010. (AR0424). On February 8, 2010, the Care Advocate reviewed the case with Dr. Murray Zucker, MD, UBH's Western Regional Medical Director. (AR0007, AR0425). Dr. Zucker requested a peer-to-peer review with the patient's treating physician, Dr. Nomi Frederick which took place on February 9, 2011. (AR0426-AR0427).

5.   Dr. Zucker's February 9, 2010 Peer Review[5]

Dr. Zucker composed the following case summary based on his conversation with Dr. Frederick:

---

[4]This statement is somewhat ambiguous. However, taking into account the January 25, 2010 admission date, the Court notes that an additional week of inpatient treatment from February 4th through February 11th would equal only approximately 2.5 weeks total stay at the inpatient level.

[5]For ease of reading, the Court has expanded the acronyms and short-hand used by Dr. Zucker in his February 9 and February 16 case notes, *infra*.

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

43 year old female admitted January 26 for severe laxative abuse (over 100 per day), malnutrition, restricting, physical consequences, and depression with suicide ideation. Patient is 5'5", admission states "75 or 81" lbs, presently 84lbs with some orthostatic changes, elevated amylase and lipase (may not be due to purging because the patient denies it and her lipase is elevated), hypokalemia on admission, and normal electrocardiogram. Extensive prior history and treatment: one inpatient and two residential treatment centers ('05 Remuda and '06 Pacific Shores) and a history of eating disorder since her teens. Her doctor recounts many stressors - old and new (husband just lost his job, daughter going away to school, six prior pregnancies ending in miscarriage, chronic depression and suicide ideation (no prior attempts)). The doctor insists on the need for continued stay: medical stabilization, suicidal risk, further weight gain. The doctor reports the patient is participating, compliant, brighter, better self-care, better relationships and "needs to consolidate gains." She states that the patient threatens to "overdose by laxatives and starve myself to death if I leave now." The doctor doesn't see any axis ii pathology. However, on further questioning she reports the patient has no immediate plan, has not gathered means, has made no preparation, and there is no one on one or even line of sight in the program. The doctor states the patient is "grieving the loss of her pregnancies." She also reports she is doing "integrated trauma work" and I suggested this is long term treatment that can be done as an outpatient when she is medically stable. I advised the following: 1) prepare for discharge on February 12; 2) follow-up with partial hospitalization program; 3) follow-up on pancreatitis and hypokalemia ([potassium] now 4.4); 4) "beware regressive therapy while inpatient."

(AR0427).

That same day the UBH Care Advocate reported that the patient was still depressed and was positive for suicide ideation with a plan to starve herself to death or overdose. (AR0428). Her activities of daily living were improving, though she had strong urges to restrict and purge with laxatives and self-induced vomiting. (AR0428). Her laxative taper was down to 3 tablets per day, her weight had increased to 84 pounds, and she was consuming 1550 calories and 84 grams of protein daily. (AR0428-AR0430). She was connecting with her peers in group therapy. (AR0429). Her therapy session with her husband was described as "difficult." (AR0429). The treatment notes indicate that her husband "wants to understand," but does not.

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

(AR0429).  Her treatment plan still included a 1550-calorie diet, suicide prevention checks every fifteen minutes, and supervision during and after meals.  (AR0429).

On February 10, 2010, Dy Wolpert, the "UR," left a voicemail verbalizing his disagreement with Dr. Zucker's peer-to-peer review.  (AR0431).  He believed continued Acute Inpatient care was medically necessary and did not believe the patient would be at a sufficient body weight come February 12, 2010 to be safely discharged.  (AR0431).  The Care Advocate returned Wolpert's call requesting that he call back with clinical information regarding the patient's treatment.  (AR0432).

> 6.     February 12, 2010 Care Advocate Review

On February 12, 2010, Pacific Shores reported that the patient was off the laxative taper, her sleep was improving, her activities of daily living were "good," and that she was eating 100% of her meals.  (AR0432-AR0433).  She was still suicidal with a plan to starve to death or overdose.  (AR0433).  She had acute pancreatitis.  (AR0433).  A family educational session was held where the Care Advocate discussed "education" and appropriate meal support with the patient's husband.  (AR0433).  The patient was not re-weighed since February 9.  (AR0433).  The treatment plan remained at 1550 calories per day because the patient was gaining weight.  (AR0434).  The notes indicate that the provider wanted the patient at 75% of IBW prior to discharge, or around 90-95 lbs.  (AR0434).  An additional three days at the inpatient level of care were authorized from February 12 through February 14th.  (AR0434).

> 7.     Dr. Zucker's February 16, 2010 Peer-to-Peer Call and Termination of Benefits at the Acute Inpatient level

On February 16, 2010, Dr. Zucker had a second peer-to-peer call with Dr. Frederick, resulting in the following case management notes:

**Case summary of Peer/Admin Review**:  43 year old female anorexia nervosa and many prior treatment failures at all levels originally presenting with severe weight loss, lab abnormal.  Depression, laxative abuse, and now at day 21 with minimal weight gain despite diet of 2100 calories.  Physician states that she has been doing well (but doesn't explain why she has not been discharged as discussed during the last review) unit dietician raised her calories today, vital signs stable, lab normal,

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

not expressing suicide ideation, was compliant with her diet, and finished laxative taper without refeeding side effects.  Medications remain at Remeron 30 mg.  I suggested increase and adding an atypical which [the treating physician] states she will do today.  Family is supportive and she will return home.  Plan is for follow-up treatment at a partial hospitalization program.  I explained that given the patient's chronicity, discharge criteria are lower weight than usual and there does not seem to be an approach to the obvious axis ii pathology.  Continued progress can occur at the partial hospitalization level.

(AR0437).

Dr. Zucker denied benefits for continued inpatient stay beyond the last covered day of February 14, 2010, reasoning that the patient did "not meet UBH Medical Necessity/Level of Care Guidelines.  You are no longer a danger to yourself or others, your medical issues have stabilized, necessary continued weight restoration can occur in the Outpatient setting, longstanding eating disorder thinking and behaviors can be addressed in an outpatient setting, partial hospitalization care is recommended and available." (AR0001, AR0437).  Dr. Zucker notified Dr. Frederick of the adverse benefits determination, verbally communicated the appeal options to Dr. Frederick, and informed her that an adverse benefits determination letter was forthcoming.  (AR0437-AR0438).  The Care Advocate then notified Dy Wolpert, the UR, by voicemail that the adverse benefit determination letter would be sent, offered the urgent and standard appeal options, requested that the UR indicate if they would be utilizing an appeal option, and requested that the facility provide verbal notification of the adverse benefits determination to Ms. Knutson.  (AR0438).

Pacific Shores, however, apparently did not inform Ms. Knutson of the adverse benefits determination when they learned of Dr. Zucker's decision on February 16, 2010.  (AR0442).  On February 18, 2010, Dr. Zucker sent a letter to the patient advising her of the denial, the rationale stated above, and the applicable UBH Level of Care Guidelines for Acute Inpatient care. (AR0009-AR0012).   Identical letters were sent to Dr. Frederick and the UR at Pacific Shores. (AR0001-AR0008).  Ms. Knutson apparently learned of the denial only when she received this letter on February 22, 2010.  (AR0442).  When asked why she was not informed earlier, the UBH Care Advocate advised Ms. Knutson that UBH had asked the treatment facility to inform her personally at the time of the adverse determination, because "they're in direct contact with you at the time," so that patients can make a decision about continuing treatment at self-pay or

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|----------|----------------------|------|-------------------|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

not. (AR0442). Ms. Knutson said she was going to contact Pacific Shores and ask them why they did not inform her of the adverse benefits determination. (AR0442).

Pacific Shores requested an urgent appeal of the adverse benefits determination on February 23, 2010. (AR0438).

8.    Dr. Center's Urgent Care Appeal Review

On February 24, 2010, the Urgent Care Appeal was reviewed by Dr. Barbara Center. (AR0439). Dr. Center is certified in Psychiatry by the American Board of Psychiatry and Neurology with a Board Certification Subspecialty in Child/Adolescent Psychiatry. (AR0439). She is Board Certified in Addiction Medicine by the American Society of Addiction Medicine. (AR0439). Dr. Center prepared a report after conducting a telephonic discussion with the patient's treating physician and reviewing the case notes. (AR0438-AR0439). A summary of Dr. Center's review follows:

**Case Summary of Peer to Peer Review:**

....

The patient has a long history of chronic eating disorder behaviors and at the time of admission was 5'5" tall and weighed 84 pounds. She is described as taking 75 to 100 laxatives daily. The patient was not suicidal, homicidal, or psychotic. The patient reported some vague suicidal thoughts, including thoughts of overdosing on the laxatives that she had been abusing.

The patient has an extensive history of prior treatment, including a previous stay at this facility in 2006. It is unclear to what extent the patient has been following up near her home in Minnesota. No comorbid substance abuse issues were identified, but the patient's medical history was remarkable for acute pancreatitis, elevated amylase and lipase, and some pedal edema following admission. The patient is married and her husband is described as supportive. The patient has a 17-year old daughter who has left for college, which has been very stressful for the patient. The daughter fears the patient will die.

Following admission, the patient had slow weight gain. She experiences significant difficulties with her bowels and is very preoccupied about how they are functioning. She requires two mineral oil enemas in order to have a bowel movement due to her long-standing laxative use. Further gastrointestinal

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

evaluations have been scheduled near the patient's home.  The patient was compliant with her meal plan and gained eight pounds over the course of her stay.  She is currently medically stable and is not suicidal, homicidal or psychotic.

**Decision and Clinical Rationale:**  By the current last covered date, February 14, 2010, the patient was 83 pounds. (67 percent ideal body weight.)  While this is a very low body weight, the patient reportedly has a history of chronic very low body weight.  Issues related to her abuse of laxatives have been successfully addressed and the patient was medically stable.  The patient was compliant with her meal plan and steadily gaining weight.  The patient was not suicidal, homicidal or psychotic.  In the reviewer's opinion, the patient does not meet the United Behavioral Health medical necessity guidelines for continued stay at the acute inpatient psychiatric level of care after the current last covered date, February 14, 2010 (UBH continued service criteria nos. 1, 2, and 9 not met).  Treatment at the partial hospital level of care should be considered.  Note, however, that the facility has opted not to pursue this and instead is transferring the patient directly to outpatient treatment.

(AR0022-AR0024, AR0439-AR0440).

Dr. Center recommended that UBH uphold the decision to issue an adverse benefits determination for mental health Acute Inpatient treatment past the last covered date of February 14, 2010.  (AR0440).

UBH Medical Director Dr. William Barnard evaluated Dr. Center's expedited appeal review and concurred with her findings that continued stay at the inpatient treatment level was not warranted.  (AR0439).  On February 26, 2010, Dr. Barnard and Dr. Center wrote to the patient and Pacific Shores advising of the denial and providing the above-stated reasons.  (AR0013-AR0016).

Ms. Knutson assigned her claim for medical benefits under the Wells Fargo & Company Health plan to Pacific Shores Hospital, the Plaintiff in this action.  *See Pl. Opening Trial Brief*, 1:25-28.  Pacific Shores exhausted all administrative remedies and now brings the current suit against UBH on behalf of Ms. Knutson for improper denial of benefits under 29 U.S.C. § 1132(a)(1)(B).  Pacific Shores seeks: (1) restitution of all past benefits due to Plaintiff, plus pre-

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|----------|----------------------|------|-------------------|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

and post-judgment interest; (2) a mandatory injunction requiring UBH to immediately qualify Plaintiff for medical benefits due and owing under the Plan, and (3) attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).  *See Compl.* 3:11-6:9.

### III.   Legal Standard

Pacific Shores brings the present action under 29 U.S.C § 1132(a)(1)(B), allowing a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  *See* 29 U.S.C § 1132(a)(1)(B).  Although Pacific Shores seeks a mandatory injunction requiring UBH to declare Ms. Knutson entitled to benefits due and owing, this claim is also brought under 29 U.S.C. § 1132(a)(1)(B), not under § 1132(a)(3), which permits a cause of a action "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

### VI.   Discussion

As noted above, the parties seek resolution of the following issues.  First, both defendants argue that their claims decision must be upheld under the abuse of discretion standard of review.  Plaintiff disputes that the abuse of discretion standard applies in this case, but argues that, in the event that it does, it must be tempered with a high degree of skepticism due to conflicts of interest and procedural irregularities.  Finally, Plaintiff argues that UBH's benefits determination cannot withstand any level of judicial scrutiny because it was arbitrary and capricious.  *Pl. Opening Trial Brief*, 13:7-25:3.  In making this showing, Plaintiff seeks to admit evidence extrinsic to the Administrative Record.  The Court first determines the appropriate standard of review.

#### A.   Standard of Review

"When Congress enacted ERISA, it did not specify the standard of review that courts should apply when a plan participant challenges a denial of benefits."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 964 (9th Cir. 2006).  In *Abatie*, the Ninth Circuit held that the Supreme Court's decision in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989),

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

"appears to provide for only two alternatives" to the applicable standard of review.  *See id.*
"When a plan confers discretion, abuse of discretion review applies; when it does not, de novo
review applies."  *Id.*

The "essential first step of the analysis" is to "examine whether the terms of the ERISA
plan unambiguously grant discretion to the administrator."  *See id.* at 963.  In this case, the
parties agree that the Plan expressly grants discretion to the Plan Administrator.  The parties
disagree, however, on whether this same language extends the Plan Administrator's
discretionary authority to UBH:

> The Administrator, and any Claims Administrator to whom such authority has
> been delegated pursuant to this Section 6, shall have the discretionary authority
> and responsibility to decide all factual and legal questions under the Self-Insured
> Health Programs, to interpret and administer the terms and conditions of the
> Self-Insured Health Programs, decide all questions concerning the eligibility of
> any persons to participate in the Self-Insured Health Programs, grant or deny
> benefits under the Self-Insured Health Programs, construe any ambiguous
> provision of the Self-Insured Program's documents, correct any defect, supply any
> omission, or reconcile any inconsistency as the Administrator, in its discretion may
> determine.  The Administrator may delegate its administrative duties to . . . entities
> independent of the Administrator.

(AR0535).
   The Plan further states that the "rules, regulations, interpretations and determinations
made by the Administrator *or any authorized person* shall . . . be final and binding on Plan
Participants and beneficiaries," and that the "validity of any such rules, regulations,
interpretations and construction of the terms of the Plan Statement and determination of Plan
issues *shall be given deferential review if challenged in court* . . . and shall be upheld unless
clearly arbitrary or capricious."  (AR0536) (emphasis added).  Finally, the SPD identifies UBH
as the Claims Administrator for mental health benefits and the Administrative Services
Agreement names UBH as a Plan fiduciary and delegates the Plan Administrator's discretionary
power to UBH.  (AR0196, AR0474).

   Because the Plan expressly granted the Plan Administrator and any authorized Claims
Administrators discretionary authority in "grant[ing] or deny[ing] benefits under the Self-Insured

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

Health Programs," the SPD identified UBH as the Claims Administrator for mental health and substance abuse benefits, and the Administrative Services Agreement delegated discretionary authority UBH as a plan fiduciary, the Court finds that the Plan unambiguously granted discretionary authority to UBH. *See Madden v. ITT Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1285 (9th Cir. 1990) (holding that because the Plan granted discretion to an Administration Committee, and a "Claims Administration Agreement" between the Committee and the defendant properly delegated that discretionary authority to the defendant as a Plan fiduciary, the "more deferential 'arbitrary and capricious' standard" applied); *cf. Shane v. Albertson's Inc.*, 504 F.3d 1166 (9th Cir. 2007); *see also Saffron v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866-67 (9th Cir. 2011) (holding plan documents unambiguously delegated discretion to third-party insurer where SPD "granted discretionary authority to 'the Plan administrator [Wells Fargo] and other Plan fiduciaries,'" MetLife was mentioned in the SPD as "one of the 'other Plan fiduciaries,'" and MetLife's Certificate of Insurance granted it discretion).

Plaintiff offers two arguments as to why the above grant of discretionary authority is insufficient. First, Plaintiff urges the Court to find a grant of discretionary authority contained in an ASA insufficient to effectively delegate authority. However, Plaintiff fails to distinguish *Madden* or *Saffron*, discussed *supra*, relying instead on two district court decisions that are distinguishable from the present case. Specifically, Plaintiff cites *Roush v. Aetna*, No. CV 09-751-PHX-NVM, 2010 WL 2079766, at *2 (D. Ariz., May 24, 2010), which differs from the present case in that the operative Plan document in *Roush* did not grant the Plan Administrator the power to delegate its discretionary authority, instead expressly reserving such authority for the Plan Administrator, and *Teplick v. Boeing Company Employee Health and Welfare Ben. Plan*, No Civ. 03-264-AS, 2004 WL 1058172 (D. Or., May 11, 2004), in which the language vesting discretionary authority in the Plan Administrator concededly "d[id] not appear in either the SPD or the Plan." Moreover, as discussed below, the Court finds that the language contained in the Plan and the SPD are alone sufficient to delegate discretionary authority to UBH.

Second, Plaintiff sees an ambiguity in the fact that the Plan and SPD do not contain an individual grant of discretionary authority to UBH by name. However, the Ninth Circuit considered and rejected this argument in *Saffron*, noting that the Plaintiff "[saw] an ambiguity in the fact that the Summary Plan Description doesn't refer to [the defendant] by name; instead, it grants discretionary authority to 'the Plan administrator [Wells Fargo] and other Plan fiduciaries.' But it's perfectly clear that [the defendant] is included in this grant of discretionary

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

## CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|----------|----------------------|------|-------------------|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

authority because it is one of the 'other Plan fiduciaries' mentioned there." *See Saffron*, 522 F.3d at 866.  The same is true in this case - the Plan grants discretion to the Plan Administrator and authorized Claims Administrators, and the SPD identifies UBH as the authorized Claims Administrator for mental health benefits.  Therefore, as in *Saffron*, "these provisions leave no doubt that [UBH] is an entity with discretionary authority to administer the Plan." *See id.* at 867.  "While the path to this conclusion is somewhat tortuous, it is also perfectly clear." *Id.*  Accordingly, the Plan gives UBH "discretionary authority to determine eligibility for benefits," and the Court is required by Supreme Court precedent to review UBH's exercise of that discretion under an abuse of discretion standard. *See Metro. Life Ins. Co. v. Glenn*, 544 U.S. 105, 111 (2008).

That the Plan grants UBH discretionary authority is only the first step in determining the standard by which the Court reviews its denial of benefits. *See Saffron*, 522 F.3d at 867.  "While we nominally review for abuse of discretion, the degree of deference we accord to a claims administrator's decision can vary significantly" depending on whether the plan operates under a structural conflict, or whether serious procedural irregularities tainted the determination. *Id.* at 867-68.  Where "the plan administrator or decisionmaker is also the party from whose pocket the claim would have to be paid, such as an insurer or an employer sponsoring a self-funded plan, the court must determine whether the denial of benefits was improperly affected by this conflict of interest." *Muniz v. Amec Const. Management, Inc.*, 623 F.3d 1290, 1295 (9th Cir. 2010).  "A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie*, 458 F.3d at 972.

In this case, UBH held the sole power to grant or deny urgent mental health benefits, while Wells Fargo bore the lone responsibility to pay for them and fund the plan.  Any potential conflict was further ameliorated by the fact that Dr. Center, the physician who decided Ms. Knutson's urgent appeal, was employed by Prest & Associates, Inc., an independent review organization.  (AR0022-AR0024); *see Abatie*, 458 F.3d at 968, 969 n.1 (noting that even a conflicted administrator "might demonstrate that it used truly independent medical examiners or a neutral, independent review process" to indicate a conflict did not influence its benefits determination).  Plaintiff presents no evidence to undermine Dr. Center's independence.  Because the claims determinations and purse strings were controlled by separate entities, the mental health benefits plan was not operating under a structural conflict of interest.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS-6

CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

Plaintiff urges the Court to conjure a structural conflict because Wells Fargo is a large company with 1.3 trillion dollars in assets.  According to Plaintiff, UBH's interest in retaining the account therefore gave them an incentive to deny claims.  The Court finds no structural conflict of interest on this fact alone that would warrant heightened judicial scrutiny.  *See Barron v. Ashland, Inc.*, CV 10-1301 SJO (VBKx), 2011 WL 5024590, at *8 (C.D. Cal. Oct. 21, 2011) ("Case law supports the conclusion that a structural conflict of interest is not created merely because a claims administrator is paid by the plan administrator for its services.") (citations omitted); *Saffron*, 522 F.3d at 868 (noting that "[e]ven where a plan operates under a clear conflict of interest, a court views "the conflict with a 'low' 'level of skepticism' if there's no evidence 'of malice, of self-dealing, or of a parsimonious claims-granting history'") (quoting *Abatie*, 458 F.3d at 966-67).  "Nonetheless, in reviewing 'all the facts and circumstances' of the matter, the Court may take note that [the defendant] maintains a contract to provide claims administration services," and that UBH may therefore have "an incentive to maintain that contract by keeping the cost of [Wells Fargo's] benefit program low."  *See Barron*, 2011 WL 5024590, at *8 (citations omitted).  However, "[t]his is simply one factor to weigh in determining whether there was an abuse of discretion."  *Id.*

There is also no evidence that UBH violated the procedural requirements of 29 CFR § 2560.503-1(b) or 29 CFR §2560.503-1(h)(3)(ii), thereby justifying a heightened level of review. 29 CFR § 2560.503-1(b) requires that a Plan "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants."  29 CFR §2560.503-1(h)(3)(ii) requires appellate review that does not afford deference to the initial adverse benefit determination. Regarding § 2560.503-1(b), administrative processes were in place to ensure that claims determinations were made in accordance with the governing plan documents.  The applicable "discharge criteria" under the Plan were outlined in the SPD and were consistently applied - Acute Inpatient care would cease when it was no longer "medically necessary" because the Plaintiff's condition did not meet the Continued Service criteria for that level of care.  Each of UBH's benefits denial letters referenced and attached the Continued Service criteria, gave reasons for the adverse determination, identified the specific Continued Service criteria that were no longer met, and conveyed the appeal options.

Plaintiff categorizes UBH's discharge criteria as inconsistent because the Care Advocate initially identified a "discharge plan" at 85% of ideal body weight, but Ms. Knutson in fact

**O**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

weighed only 67% of her ideal body weight when her Acute Inpatient services were discontinued.  *See Pl. Opening Trial Brief*, 23:5-24.  However, this was merely one of several discharge criteria originally identified, the others being that the patient was no longer purging, was no longer suicidal, and had been tapered off the laxatives.  (AR0415).  Aside from her low body weight, each of these criteria was found to be met.  Dr. Center also found that Ms. Knutson was slowly gaining weight, was compliant with her meal plan, had scheduled follow-up care near her home in Minnesota, was medically stable, and "was motivated for recovery." (AR0415).  Plaintiff argues there is no medical basis for downwardly adjusting a patient's discharge weight based on a history of chronic low body weight, and therefore that UBH's departure from the original discharge criteria was at best illogical, and at worst pretextual. However, the record reveals that the patient was not discharged merely because she had a history of very low body weight, rather, this was offered as one explanation as to why this particular criterion might be lower where, as here, a holistic review of the patient's overall condition, history, and progress demonstrated that continued weight restoration and recovery could occur at the partial hospitalization level.  That UBH adjusted a single criterion based on the Plaintiff's overall condition does not establish that this change was arbitrary, nor does it establish that the Plan provisions were applied inconsistently with respect to similarly situated claimants, or that such a rigid application of the "similarly situated claimant" standard is appropriate to the individualistic determination of when a patient with a 20-plus year history of anorexia, including prior hospitalizations, could safely receive ongoing care in a partial hospitalization setting.  *See* 29 CFR § 2560.503-1(b)(5).

Plaintiff's reliance on *Joas v. Reliance Standard Life Ins. Co.*, 621 F. Supp. 2d 1001 (S.D. Cal. 2007) is misplaced.  *See Pl. Opening Trial Brief*, 24:12-27.  In that case, the defendant refused "to 'provide Plaintiff with examples of how Defendant interpreted the terms of the policy with respect to similar situated persons seeking benefits.'"  There is no evidence in this case that Plaintiff requested and was refused examples of how the UBH Level of Care guidelines had been interpreted with respect to other anorexia patients.  *See Joas*, 621 F. Supp. 2d at 1008 ("The Court concludes that Defendant's failure to provide Plaintiff with requested information and to consider whether it was interpreting the insurance policy consistently during Plaintiff's benefits determination requires this Court to temper the abuse of discretion standard with a fair amount of skepticism.") (emphasis added).  Moreover, unlike *Joas*, the there is no evidence in this case that UBH equivocated with respect to the operative plan language in order to minimize its liability in other litigation.  *See Joas*, 621 F. Supp. 2d at 1008.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

The Court also finds that UBH complied with the requirements of 29 CFR § 2560.503-1(h)(3)(ii).  That section requires a plan to provide "for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual."  29 C.F.R. § 2560.503-1(h)(3)(ii).  Pacific Shores contends Dr. Center's review improvidently afforded deference to Dr. Zucker's decision because she was "only provided [with] the most recent case management note and D. Zucker's denial."  *See Pl. Opening Trial Brief*, 25:11-13; (PSH476; PSH480-488).  But the UBH case management notes restate all prior entries before adding a new one.  Therefore, to say that Dr. Center "was only provided the most recent case management note" is disingenuous.  The record demonstrates that Dr. Center's denial was based on her own review of the case notes and a peer-to-peer telephone discussion with Dr. Frederick. While the fax cover letter informed Dr. Center of one of Dr. Zucker's rationales in denying ongoing benefits, there is no evidence that Dr. Center deferred to or relied on Dr. Zucker's denial, as opposed to the accompanying case notes and her own telephonic peer-to-peer conference with Dr. Frederick.  Absent some other serious procedural defect in UBH's review of Plaintiff's claim, the Court proceeds with an application of the abuse of discretion standard of review.  *See Montour*, 588 F.3d at 629.

     B.     <u>UBH's adverse benefits determination</u>

The Ninth Circuit's standard for abuse of discretion review has been "gradually refined and restated."  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 673 (9th Cir. 2011). In *Salomaa*, the Court explained that the test for abuse of discretion in a factual determination is whether "we are left with a definite and firm conviction that a mistake has been committed," and the Court may not merely substitute its view for that of the fact finder.  *See id*. at 676 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).  In applying this test in the ERISA context, Courts are to consider whether application of the correct legal standard was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record."  *See id*.

"Applying a deferential standard of review [] does not mean that the plan administrator will always prevail on the merits.  It means only that the plan administrator's interpretation 'will not be disturbed if reasonable.'"  *Conkright v. Frommert*, 130 S.Ct. 1640, 1644 (2010) (quoting *Firestone*, 489 U.S. at 111).  Because the standard of review is abuse of discretion, our factual review is limited to the administrative record.  *See Abatie*, 458 F.3d at 970 ("Today, we continue

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

to recognize that, in general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review.").

UBH's reasons for discontinuing benefits at the Acute Inpatient level of care remained consistent throughout the review process. *Cf. Salomaa*, 642 F.3d at 676 (criticizing an administrative decision where the "reasons for denial shifted, as old reasons, proved erroneous, were replaced by new ones"). After speaking with Ms. Knutson's treating physician independently and on different occasions, both Dr. Zucker and Dr. Center provided the same rationale for discontinuing Acute Inpatient benefits: continued progress could occur at the partial hospitalization level because the patient was no longer suicidal, she was medically stable, her laxative abuse had been successfully addressed, she was compliant with her meal plan, she was steadily, if slowly, gaining weight, she was motivated for recovery, and follow-up care options were available a lower level of treatment. (AR0437, AR0439-AR0440). Dr. Barnard concurred with Dr. Center's findings. (AR0439). Because the ninth Continued Service criterion requires that a member be unable to "move toward recovery and be safely treated at a lower level of care," UBH's conclusion that Plaintiff could be treated at the partial hospitalization level precluded further Acute Inpatient benefits. (AR0410-AR0411).

The Administrative Record provides factual support for these conclusions, such that the Court cannot say the denial was illogical, implausible, or unsupported. *See Salomaa*, 642 F.3d at 676. Dr. Center's notes from her telephonic peer review with Ms. Knutson's treating physician, Dr. Frederick, state that by the time of the adverse determination she was medically stable and was not suicidal. (AR0439-AR0440). This is consistent with Dr. Zucker's notes from his February 16, 2010 Peer-to-Peer review in which Dr. Frederick informed him that the patient was no longer experiencing suicidal ideation, which, in turn, is consistent with Dr. Frederick's admission several days earlier that although the patient threatened to overdose by laxatives or starve herself to death if she were discharged, the patient had no immediate plan, had not gathered means, and had made no preparation. (AR0427, AR0437). This was true despite the fact that there was no one-on-one or even "line-of-sight" supervision in the program. (AR0427).

This is not to say that either Dr. Center's or Dr. Zucker's reviews were perfect. The Court notes that Dr. Center mistakenly reported that the "patient was not suicidal" at the time of admission, but "reported some vague suicidal thoughts, including thoughts of overdosing on the laxatives she had been abusing," and that Dr. Zucker erroneously noted there was no prior

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

history of suicide attempts. (AR0023). In fact, the Care Advocate notes indicate that at the time of admission Ms. Knutson was positive for "suicidal ideation" with a plan to overdose, and that she had a prior history of one suicide attempt in 2007. (AR0414). The Court also notes that while Dr. Center placed the patient's daily laxative abuse at between 75 and 100 laxatives, the treatment notes in fact suggest she was taking approximately 130 laxatives daily. (AR0414, AR0023). The fact that Dr. Center mistakenly reported that Ms. Knutson was "reporting some vague suicidal thoughts," instead of that she was positive for suicidal ideation, that she minimized Ms. Knutson's laxative abuse somewhat, and that Dr. Zucker was mistaken with regards to Ms. Knutson's prior suicide attempt "could be a sign of either inattention to important details or of bad faith." *See Saffron*, 522 F.3d at 873. However, as defense counsel pointed out at the hearing, both Dr. Center and Dr. Zucker spoke with Ms. Knutson's treating physician before writing their reviews; accordingly, the Court acknowledges the possibility that these errors were the result of a miscommunication by the patient's treating physician. Given that both doctors based their decisions on the fact that Ms. Knutson was not suicidal at the time of the adverse benefits determination, and not that she had never been suicidal or attempted suicide, and that Dr. Center nonetheless identified that Ms. Knutson was taking an extraordinary number of laxatives daily at the time of admission, the Court finds that the above errors alone do not leave the Court with "a definite and firm conviction that a mistake has been committed," particularly in light of the fact that the patient's treating physician informed Dr. Zucker that Ms. Knutson was no longer expressing suicidal ideation. *See Salomaa*, 642 F.3d at 676; (AR0437). Nevertheless, in light of these mistakes the Court engages in a comprehensive review of the basis for Dr. Center's and Dr. Zucker's denials, and finds them to be supported by the Record.

The Administrative Record supports a finding that, as of the last-covered date, Ms. Knutson had finished the laxative taper, was connecting with her peers in group therapy, and was consuming between 1550 and 2100 calories per day. (AR0429, AR0437). Although the patient remained at a "very low body weight," the Record shows Ms. Knutson's low body weight was partially the result of inpatient weight-loss due to diuresing. (AR0418). She had since regained at least eight pounds and was compliant with her meal plan. (AR0418, AR0428-AR0430). While Ms. Knutson was receiving prompting during meals and supervision for 2.5 hours after eating, she was eating 100% of her food on her own volition, and Dr. Zucker plausibly concluded that these services and other necessary weight restoration procedures could be provided in a partial hospitalization setting. (AR0437). Likewise, the patient was connecting with her peers in group therapy, and was doing "integrated trauma work," which Dr. Zucker reasonably assessed as "long term treatment that can be done as an outpatient when she is

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JS-6

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |

medically stable." (AR0427, AR0429). Her husband, who was described as "supportive, but not emotional" had been educated regarding ongoing meal support, and the family was participating in therapy sessions in which they discussed the toll Ms. Knutson's illness had taken on the family. (AR0414, AR0431). Dr. Frederick, the patient's treating physician, informed Dr. Zucker that Ms. Knutson had been doing well, her vital signs were stable, her lab results were normal, she was not expressing suicide ideation, was compliant with her diet, and had finished the laxative taper without refeeding side effects. (AR0437).

Dr. Center consulted with Ms. Knutson's treating physician, independently considered Ms. Knutson's ongoing health issues and decided they could be addressed a lower level of care. Dr. Center noted that while Ms. Knutson was at a very low body weight, she reportedly had a history of very low body weight, was medically stable, was compliant with her meal plan and gained eight pounds over the course of her stay. She was no longer suicidal, and issues related to her abuse of laxatives had been successfully addressed. Dr. Center acknowledged that the patient still required two mineral oil enemas in order to have a bowel movement due to her long-standing laxative abuse, and specifically noted that "[f]urther gastrointestinal evaluations have been scheduled near the patient's home." (AR0439-AR0440). Dr. Center identified Ms. Knutson's acute pancreatitis, elevated amylase and lipase, and pedal edema and recommended that treatment be continued at the partial hospitalization level. (AR0439-AR0440).

Even taking into account Dr. Zucker's and Dr. Center's errors, the Administrative Record provides a reasonable basis for their ultimate conclusions that continued progress could occur at the partial hospitalization level, and under an abuse of discretion standard, this Court may not disturb UBH's decision if it was reasonable. "Reasonableness does not mean that we would make the same decision." *Salomaa*, 642 F.3d at 675. Because the Court is not left with a definite and firm conviction that UBH's benefits determination was in error, Plaintiff is not entitled to the requested relief.

III.    Conclusion

For the reasons stated above, the Court finds for Defendants.

**IT IS SO ORDERED.**

**O**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**JS-6**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-5828 PSG (CWx) | Date | December 19, 2011 |
|---|---|---|---|
| Title | Pacific Shores Hospital v. United Behavioral Health, *et al.* | | |